# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| MARY HAMPTON DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:06CV00003 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| ADELPHIA COMMUNICATIONS | ) | By: James P. Jones |
| CORPORATION, ET AL., | ) | Chief United States District Judge |
| | ) | |
| Defendants. | ) | |

*Carl E. McAfee and Timothy W. McAfee, Norton, Virginia, for Plaintiff; Erin S. Downs and Robert F. Peel, Jones, King and Downs, P.C., Bristol, Tennessee, for Defendants Sarah D. Clark, Steffony M. Kannon, Nathan L. Davis, and Emmanuel Jason Davis.*

The plaintiff, Mary Hampton Davis, is the widow of Gregory Davis. She filed this action in state court against her late husband's four adult children from another marriage, as well as his former employer, Adelphia Communications Corporation, the manager of his 401(k) account, T. Rowe Price Retirement Plan Services, Inc., and his group life insurer, Metropolitan Life Insurance Company. She contends that her husband's death-bed changes of beneficiary of his life insurance policy and 401(k) plan were invalid and that she—and not his children—is entitled to be paid the proceeds.

The action was timely removed from state court to this court based on federal subject-matter jurisdiction pursuant to Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.A. §§ 1001-1144 (West 1999 & Supp. 2006). Thereafter, the proceeds of the life insurance policy ($104,000) and the 401(k) plan ($151,398.04) were paid into the treasury of the court and all of the defendants except the four adult children were dismissed. A bench trial was held on January 17, 2006, and this opinion contains the court's decision in the matter.

A. FINDINGS OF FACT.

As required by Federal Rule of Civil Procedure 52(a), and based on my opportunity to assess the credibility of the witnesses, the following are my findings of fact.

1. Mary Hampton Davis ("Mary") and Gregory Davis ("Greg") were married on April 9, 2003. Sarah D. Clark, Steffony M. Kannon, Nathan L. Davis, and Emmanuel Jason Davis are Greg's adult children from an earlier marriage.

2. Greg was employed by Adelphia Communications Corporation ("Adelphia") and participated in Adelphia's employee welfare benefit plan which included a policy with Metropolitan Life Insurance Company ("MetLife policy") and a 401(k) plan managed by T. Rowe Price Retirement Plan Services, Inc. ("401(k)

plan").[1] Following the marriage, Mary was the sole primary beneficiary of the MetLife policy and the 401(k) plan.

3. In September 2005, Greg began experiencing stomach problems. On October 12, 2005, he was diagnosed with stage four gastric cancer that had metastasized to his lungs. At a visit with an oncologist on October 18, 2005, Greg was told that he might have a year to live. After his diagnosis and prognosis were confirmed by doctors at Vanderbilt University Medical Center, Greg began treatments in Kingsport, Tennessee.

4. Greg's condition quickly deteriorated. On October 28, 2005, he was taken by ambulance to Wellmont Lonesome Pine Hospital in Big Stone Gap, Virginia, and was admitted into the intensive care unit with a diagnosis of respiratory distress and bilateral pneumonia secondary to advanced gastric cancer that had metastasized to the lungs. He was placed on antibiotics, steroids, and pain medications. He was also given breathing treatments and an oxygen mask. The pain medications were increased over the next few days to make him more comfortable.

---

[1] A 401(k) plan is a type of retirement plan to which the employee and employer may contribute on a tax-deferred basis. *Bulls v. Norton Cmty. Hosp., Inc.*, 76 F. Supp. 2d 710, 711 n.1 (W.D. Va. 1999)

5. On November 5, 2005, Greg and his family discussed Greg's prognosis and treatment options with Dr. Michael Wheatley and agreed that there would be no further treatments. Only comfort care would be administered.

6. Greg wished to get his affairs in order and asked his son Nathan to hire a lawyer. Nathan called attorney Lewey Lee, whose son was a co-worker and friend of Nathan's, and asked if Lee would help Greg in arranging a will.

7. Lee came to Greg's hospital room on November 6, 2005. While Nathan greeted Lee and walked him to Greg's room, Nathan was not present during the meeting. Other than Lee and Greg, Greg's mother, Joyce Arnold, was the only other person present. Greg had requested that his mother be present but she did not participate in the discussion.

8. During this meeting, Greg instructed Lee to draw up a will leaving Mary a car debt free, $8,000 in cash, the house they owned together, and any furniture accumulated during the marriage. The house he owned prior to marrying Mary was to be left to his children and he wanted the home equity loan on that home to be paid off. Any money left over was to be applied towards a loan on a house that Mary owned independently. Greg also asked Lee to leave the proceeds of the MetLife policy and his 401(k) plan to his children in equal shares.

9. Lee informed Greg that he would draft a will as directed but that to leave the 401(k) plan and MetLife policy proceeds to his children, Greg needed to designate his children as the beneficiaries on separate beneficiary designation forms. Greg requested that his mother contact Adelphia and get the documentation necessary to name his children as the beneficiaries.

10. Lee also suggested that Greg appoint a power of attorney in case someone needed to carry out his wishes. Greg then asked Arnold whether she would serve as his power of attorney and she agreed.

11. Lee prepared the general power of attorney the following morning, November 7, 2005, and it was signed by Greg that day. However, the will was not completed until November 9, 2005, and Greg died before he could execute it.

12. On November 7, 2005, Greg was visited by Wendy Swiney, who was then a human resources coordinator at Adelphia, and Larry Matthews, another Adelphia employee. As directed by Greg during the meeting with Lee, Arnold had called Swiney to see if she could come to the hospital to discuss the 401(k) plan and the MetLife policy. Arnold had indicated to Swiney in the telephone conversation that Greg wanted to see what was in these plans and who his beneficiaries were. Throughout this visit, Arnold and Mary were also in the hospital room. None of the children were present.

- 5 -

Case 2:06-cv-00003-JPJ-PMS   Document 71   Filed 02/22/07   Page 5 of 15   Pageid#: 474

13. Swiney came to the hospital that day with the relevant forms in a sealed envelope. She and Matthews had agreed that they would not open this sealed envelope unless and until they had spoken with Greg directly and felt completely comfortable that he was mentally competent to sign the forms and that the beneficiary designations were truly his wishes.

14. During the meeting, Greg was alert and sitting up in bed. Before they discussed the forms, Greg chatted with Swiney and Matthews about news from his old job. Greg initiated the discussion about the beneficiary designation forms by stating to Swiney, "Young lady, we've got some things to discuss." At this point, Swiney felt comfortable unsealing the envelope.

15. Greg then signed the beneficiary designation form for the MetLife policy and designated his children as his beneficiaries. Swiney helped Greg fill out the form and took it with her. Because Greg did not know some of the necessary information such as his children's addresses and birth dates, Swiney was not able to complete the form until that information was faxed to her the following day. She then mailed the form to MetLife.

16. While Swiney discussed the 401(k) plan with Greg during the November 7th meeting, the 401(k) plan beneficiary designation form was not signed that day.

This form was missing from the sealed envelope and Swiney faxed a copy the following day.

17.   Swiney was sitting on one side of Greg's hospital bed as she and Greg discussed his decision to change his beneficiaries from Mary to the children for both the MetLife policy and the 401(k) plan. She explained to him what he needed to do to make those changes. While Mary was sitting only a few feet away on the other side of the bed, she not did say anything during this meeting. Swiney never spoke directly with Mary about either the MetLife policy or the 401(k) plan.

18.   The next day, November 8, 2005, Mary signed the 401(k) beneficiary designation form in Greg's hospital room, purporting to waive her rights as Greg's spouse in his 401(k) plan. Present were Greg, Arnold, and Kirby Hearl, Greg's financial advisor. The children were not present at this meeting.

19.   Mary had arrived at the hospital for this meeting after being called by Nathan and told that her presence was needed to sign a 401(k) form. She had been at home preparing their house for hospice care because Greg was to be discharged the following day.

20.   When Mary arrived in Greg's hospital room form, Arnold placed a single sheet of paper on a bedside table and pointed to where Mary needed to sign. Mary did not discuss the form with Greg, although he was awake when she signed.

- 7 -

Furthermore, while Greg had an oxygen mask on that made it difficult for him to talk, he was capable of speaking.

    21. The paper that Mary signed was a single-spaced printed form with blanks for names, signatures, and dates to be filled in. The form contained the following printed language, next to a heading designated "Consent of Spouse":

> I, _____, am the spouse of the Participant named on this form. I understand that I have the right to receive my spouse's entire vested account in the plan after my spouse dies. I hereby waive that right and permit my spouse's plan account to be paid to the beneficiary(ies) designated by my spouse on this form. However, I do not consent to any changes in the beneficiary(ies) unless I agree to the change. By signing this consent, I understand that I will receive no benefits from the plan after my spouse dies unless I am designated as a primary beneficiary on this form. I understand that I do not have to sign this consent, but do so voluntary. I also understand that I cannot revoke my consent to the beneficiary(ies) designated on this form.
>
> _____    _____
> Date                  Spouse's Signature (must be notarized)

Mary printed her name in the blank and signed and dated it, but she did not read the paper before she signed it and did not understand that by signing it she was waiving her rights in the 401(k) plan. Her signature was notarized by Kirby Hearl.

    22. The paper signed by Mary is the last page of a four-page 401(k) plan beneficiary designation form. This last page did not indicate the intended beneficiaries of the plan, but instead the children were listed as the beneficiaries on

- 8 -

the other three pages of the form. The other pages were not attached when Mary signed the last page and she did not know that they were designated on the form until after Greg's death. There is no evidence that the other pages had even been completed at the time of her signature, nor is there any evidence that Greg had already signed the form when Mary was asked to sign it. Greg's signature was on the page that Mary signed, above the Consent of Spouse section, under a sentence stating, "Any election I have made on this form revokes all prior designations with respect to this Plan."

23. Greg passed away on November 9, 2005.

24. Swiney received a copy of the 401(k) plan beneficiary designation form on November 10, 2005. All four pages of the form were complete except that the first page was missing Greg's demographic information. Swiney added this information and submitted the form to the plan administrator.

25. Mary was not given a copy of the 401(k) plan beneficiary designation form when she signed it, but she did receive a faxed copy from Swiney after Greg's death. It was only then that she learned that it named Greg's children as the 401(k) plan beneficiaries in her place.

26. Greg was mentally competent when he signed the beneficiary designation forms for both the 401(k) plan and the MetLife policy. While he was physically deteriorating, and taking several prescribed medications, he was alert and understood

the nature and effect of his actions. His decision to change beneficiaries was his own personal decision and was not influenced by any of his children or his mother. He did not rely on any of his children or his mother for financial advice.

B. ANALYSIS.

Undue Influence Claim.

This court has jurisdiction of the dispute pursuant to ERISA. While the plaintiff relies on a state law claim of undue influence,[2] any such state cause of action is preempted by ERISA. *See* 29 U.S.C.A. § 1144(a); *Tinsley v. GMC*, 227 F.3d 700, 704 (6th Cir. 2000); *Clark v. Bd. of Trs. S.S. Trade Ass'n, Int'l Longshoremen's Ass'n Benefit Trust Fund,* No. 89-1431, 1990 WL 15617, at *4 (4th Cir. Feb. 14, 1990) (unpublished). Nevertheless, I may look to state law "to guide [my] federal-common-law analysis of [the plaintiff's] undue influence claim." *Tinsley*, 227 F.3d at 704.

As the plaintiff agrees, because undue influence is a type of fraud, it must be proved by clear and convincing evidence. *Friendly Ice Cream Corp. v. Beckner*, 597 S.E.2d 34, 38 (Va. 2004). It requires prima facie evidence of "great weakness of mind and grossly inadequate consideration or suspicious circumstances" or the existence of a fiduciary or confidential relationship. *Id.* at 38, 39. If these elements are shown by

---

[2] While other state law claims were raised in the complaint, the plaintiff conceded at trial that the only such claim now asserted is that the changes in beneficiary were procured by undue influence upon the decedent.

- 10 -

clear and convincing evidence, the burden of going forward with the evidence shifts to the proponent of the transactions in question. *Id.* at 39.[3]

Based on my findings of fact, I hold that the plaintiff has failed to prove that the changes in beneficiary were caused by undue influence. While Greg suffered from a debilitating terminal illness, the evidence is far from showing that his mental capacity had deteriorated to any substantial extent at the time he signed the change in beneficiary forms on November 7 and 8.[4] Moreover, there is insufficient evidence of any suspicious circumstances or fiduciary or confidential relationship with regard to the changes in beneficiary. While it is apparent that Greg's mother and some of his children facilitated the transactions to some degree, there is no evidence that they had any financial relationship with the decedent or that the circumstances were suspicious in any fashion. In short, the evidence shows that Greg made the decision to change beneficiaries based on his own inclinations and free will.

---

[3] The defendants contend that the more difficult proof regime applicable to a claim of undue influence in will contests should apply, in which the burden of proof always remains with the plaintiff. *See Leimbach v. Allen*, 976 F.2d 912, 917 (4th Cir. 1992) (applying Maryland law). However, in light of the fact that I find that the plaintiff has not met the lesser standard, it is not necessary for me to decide this issue.

[4] The plaintiff asserts that Greg's spelling of his daughter's name as "Seffony" on the MetLife beneficiary designation form rather than the correct "Steffony" is evidence of his weaken mental capacity, but I reject that contention in light of the considerable contrary evidence.

Compliance with ERISA as to 401(k) Plan.

The plaintiff contends that as to the 401(k) plan, the purported change in beneficiary, even if not procured by undue influence, was invalid because it did not comply with the terms of the plan and ERISA.[5]

ERISA requires that plan benefits such as these be paid to a surviving spouse, absent a proper election by the plan participant. 29 U.S.C.A. § 1055(c)(1)(A)(i). Such an election is effective only if:

> (i) the spouse of the participant consents in writing to such election, (ii) such election designates a beneficiary (or a form of benefits) which may not be changed without spousal consent (or the consent of the spouse expressly permits designations by the participant without any requirement of further consent by the spouse) and (iii) the spouse's consent acknowledges the effect of such election and is witnessed by a plan representative or a notary public.

29 U.S.C.A. § 1055(c)(2)(A). The spousal protections contained in § 1055(c) "were intended to ensure a stream of income to surviving spouses" and these "formalities must, therefore, be strictly enforced." *Hagwood v. Newton*, 282 F.3d 285, 290 (4th Cir. 2002) (internal quotations omitted) (declaring waiver contained in premartial agreement invalid).

---

[5] The plaintiff's claims as to the validity of the waiver of beneficiary for the 401(k) plan were not expressly raised in the Complaint, but they were tried without objection and thus they are treated as raised in the pleadings. Fed. R. Civ. P. 15(b).

- 12 -

The 401(k) plan of which Greg was a participant incorporated the spousal protections mandated by ERISA. It provides that

> in the case of a married Participant, the Participant shall be deemed to have designated his surviving spouse as his sole primary Beneficiary, notwithstanding any contrary written notice, unless such spouse filed a written voluntary consent with the Plan Administrator irrevocably consenting to the Participant's designation of a non-spouse Beneficiary, which consent shall be notarized or witnessed by the Plan Administrator, and shall acknowledge the effect of the change.

(Pl.'s Ex. 6, p. 69.)

The document signed by Mary did not designate a nonspousal beneficiary. Section 1055(c) requires that the consent be to the actual designation of another beneficiary, in order to give the surviving spouse control over who is to receive the benefits in lieu of the surviving spouse. *See Hagwood*, 282 F.3d at 291. While there is no evidence on the issue, it is just as likely as not that the beneficiary designations were not written down until after Mary signed the consent form. Regardless of when the beneficiary designations were written down, however, the circumstances show that Mary did not consent to the nonspousal beneficiaries.

The children argue that Mary knew that they would be the new beneficiaries of the 401(k) plan, because she was present when Greg discussed changing the beneficiaries with Swiney, the human resources officer. I have found as a matter of fact that Mary did not understand that she was consenting to the change of

- 13 -

beneficiaries when she signed the form. Based on my credibility determination, it is reasonable to believe that Mary, sitting at bedside of her dying husband, would not have focused on such a conversation. This is particularly true because there is no claim by the children that anyone at any time prior to Greg's death directly discussed with Mary the changes in beneficiaries.

In any event, § 1055(c) requires strict compliance with the necessary formalities, in order to better protect surviving spouses. *See Lasche v. George W. Lasche Basic Profit Sharing Plan*, 111 F.3d 863, 867 (11th Cir. 1997) (holding that failure to notarize surviving spouse's signature made waiver invalid, even where spouse admitted signing).

The children also contend that a refusal to accept this waiver would make it difficult for plan administrators to rely on designations of a nonspousal beneficiaries. However, plan administrators have considerable discretion in performing their duties, and that discretion would include validating a waiver that appeared proper. *See Vilas v. Lyons*, 702 F. Supp. 555, 559-60 (D. Md. 1988) (holding that where waiver was regular on its face and plan administrator had no actual knowledge of its invalidity, it may rely on the waiver even if it turns out to be invalid). The plan administrator here, however, made no determination that the waiver was valid. Thus, this court's

job is not to review the reasonableness of a plan administrator's determination, but to decide the question de novo.

For these reasons, I find that Mary's consent to a change in beneficiary was invalid and thus she is entitled to the proceeds of the 401(k) plan.[6]

II

The claim by the plaintiff to her late husband's MetLife policy proceeds is rejected and that amount will be paid to his children. She is entitled to the proceeds of his 401(k) plan, and that amount will be paid to her.

A separate judgment will be entered forthwith.

DATED: February 22, 2007

/s/ JAMES P. JONES
Chief United States District Judge

---

[6] Mary also contends that the waiver was invalid because she did not herself file the written consent with the plan administrator. However, because of my holding, it is not necessary for me to reslove this claim.

- 15 -